WESTRECO, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Westreco, Inc. v. Commissioner
Docket No. 24078-88
United States Tax Court
T.C. Memo 1990-501; 1990 Tax Ct. Memo LEXIS 554; 60 T.C.M. (CCH) 824; T.C.M. (RIA) 90501; September 20, 1990, Filed *554 Agents of the Commissioner examined the income tax returns of petitioner and related corporations for taxable years subsequent to the years before the Court. One of the issues raised in the examination is identical to the issue involved in this proceeding. Counsel for respondent in this proceeding actively participated in the examination of the returns for subsequent years. Held, the activities of respondent's counsel and the use of administrative summonses of petitioner's employees in the subsequent years' audit undermines the Court's Rules on discovery. Title VII, Tax Court Rules of Practice and Procedure. Respondent's counsel in the instant proceeding may not participate in both the trial of this case and the examination of petitioner's returns and those of related corporations for subsequent years. Held further, respondent shall maintain a log of all evidence obtained in the examination of such returns to assist the Court in maintaining the integrity of its Rules. Held further, respondent will be prohibited from using in this proceeding any testimony, documents, or other information obtained pursuant to the administrative summonses. Universal Manufacturing *555 Co. v. Commissioner, 93 T.C. 589 (1989), followed. Joel V. Williamson, William A. Schmalzl, Thomas C. Durham, Alexander Spitzer, Gary P. Kirschenbaum, Joseph R. Goeke, David A. Hyman, Mark I. Levy, Arthur R. Miller, and Gregory L. Barton, for the petitioner. Abraham N. M. Shashy, Jr., Mildred M. Moon, Bernard Goldstein, Jane Wilson, and Raymond Kahn, for the respondent. GOFFE, *557 Judge. GOFFE
MEMORANDUM OPINION This matter is presently before us on respondent's motion for reconsideration of a protective order which was modified and clarified by subsequent orders. Petitioner is a subsidiary of Nestec Ltd. (Nestec), a Swiss corporation. Nestec is, in turn, a subsidiary of Nestle S.A. (Nestle). These corporations and related corporations are presently before the Court in this and related docketed cases. The cases involve over 50 complex legal and factual issues with deficiencies in income tax and additions to tax aggregating in excess of $ 50 million. In this case, the Commissioner determined deficiencies in petitioner's income tax liabilities for the following taxable years: Taxable
Year
Deficiency
1978
$ 1,520,238
1979
1,713,878
1980
1,714,266
1981
1,712,071
1982
2,169,397
The only substantive issue is an adjustment under section 482[1] to the fee for contract research services paid by Nestec to petitioner. The protective order under reconsideration arose in connection with the examination of the income tax returns of petitioner, Nestec, and other Nestle-related corporations for the taxable years 1983 through *558 1985. The periods of limitations for assessment of additional income tax for those years were to expire on June 30, 1990. Procedural Background
It is necessary to enumerate the procedural steps which have occurred in order to fully appreciate the significance of the protective order and its clarification and modification. On February 21, 1990, the Court filed Petitioner's Motion for Protective Order in which petitioner alleged that respondent, in conducting the 1983-1985 audit, issued four summonses and a Formal Document Request under section 982 which relate to a proposed adjustment under section 482 which would be identical to the adjustment determined in the instant case. The summonses were issued pursuant to section 7602 and were limited to the taxable years 1983 through *559 1985. The individuals who were served with summonses were Donald L. Wetherilt, Research Director of petitioner, and Joseph L. Ohler and Angus R. Freathy, employees of petitioner. All three of them were previously interviewed by agents of the Internal Revenue Service in connection with examination of the returns for the years before the Court. Copies of the summonses attached to petitioner's motion contain notice that transcripts of the testimony may be made pursuant to section 7520. Petitioner alleged that trial counsel for respondent in the instant case would attend the hearings covered by the summonses. Petitioner requested the protective order on the grounds that the summonses and document request might be used to gather information for use in the instant case pending in the Tax Court and, thus, circumvent the discovery Rules of the Tax Court. Accompanying petitioner's motion was a Memorandum in Support of Petitioner's Motion for Protective Order. We granted respondent leave to file a notice of objection on or before March 29, 1990. The Court filed respondent's Notice of Objection and accompanying Memorandum in Support of Respondent's Notice of Objection to Petitioner's *560 Motion for Protective Order on March 8, 1990. On March 12, 1990, the Court filed petitioner's Motion for Leave to File Reply to Respondent's Notice of Objection and Accompanying Memorandum which we granted on March 19, 1990, and granted petitioner until March 30, 1990, to file its response. The Court filed Petitioner's Response to Respondent's Notice of Objection to Petitioner's Motion for Protective Order on March 20, 1990. Petitioner attached copies of letters from respondent's counsel, Theodore J. Kletnick (Mr. Kletnick), to Joel V. Williamson (Mr. Williamson), counsel for petitioner, and to Alexander Spitzer (Mr. Spitzer), Vice President-Taxes of Nestle Holdings, Inc. At that time Mr. Kletnick was "lead" counsel for respondent in the instant case and was assisted by Jeannette D. Schmelzle (Ms. Schmelzle) and Roland Barral (Mr. Barral). The letters, dated from February 21, 1990, to March 8, 1990, reflect heavy involvement of Mr. Kletnick in the 1983-1985 audit. A letter from Mr. Kletnick to Mr. Spitzer dated February 21, 1990, demonstrates the depth of Mr. Kletnick's involvement in the audit process. It should be pointed out that Mr. Kletnick is not directing counsel for *561 petitioner to comply with the informal document request but he is, instead, directing his comments to Mr. Spitzer as vice president of Nestle Holdings. The complete letter is reproduced below: REGIONAL COUNSEL Internal Revenue Service NORTH ATLANTIC REGION 7 World Trade Center, 25th Floor New York, NY 10048 CC:NA:TL TJKletnick FEB 21 1990 Mr. Alexander Spitzer
Vice President - Taxes Nestle Holdings, Inc. Five High Ridge Park Stamford, CT 06905 In re: NHI, IDR No. 174 Dear Mr. Spitzer: On February 7, 1990, the Examination Division issued IDR No. 174. By letter dated February 14, 1990, you provide an initial response. * This matter has been referred to this office. *562 With respect to your claim regarding intercompany pricing issues, we direct your attention to Judge Scott's order dated December 18, 1989 in National Semiconductor Corporation v. Commissioner, docket No. 4754-89. Mr. Williamson can provide you with a copy of the order. Moreover, and indicative of your failure to focus on the real issues, the pricing issues (1) are relatively de minimis in relation to the items being considered by the Examination Division, (2) involve primarily Exportrade, an entity not at issue during the docketed years, and (3) request information limited to 1983 to 1985, not prior to 1983. Given this precedent and the factual differences, we view your misapplication of the audit process argument as frivolous. On or about February 14, 1990, you began producing documents and indicated that your search was continuing and that a substantial number of other documents would be made available in a prompt and timely manner. Accordingly, we are not addressing each and every item. We have made a preliminary review of the documents submitted and your letter dated February 14, 1990. We are accepting in good faith your representation that you "will be making *563 available additional documents as they become available." Additionally, we expect that you will make witness [sic] who are U.S. citizens available for testimony upon request no later than March 30, 1990. Accordingly, the Examination Division is deferring until February 28, 1990 any decision on the issuance of summonses and formal document requests. Our comments on your letter are as follows: 1. Item 1, 8 and 48 to 54, inclusive, are extremely significant and we expect prompt responses that are full and complete. The information requested by items 48 to 54, inclusive, relates to our determination of the correctness of the 1985 royalty payment. As you know, that payment was made pursuant to an entirely new royalty agreement with, among other aspects, an expanded scope of products covered. The 1983 and 1984 royalty payments are not currently under consideration. In addition, we expect to ascertain the correctness of these items (1, 8 and 48 to 54, inclusive) through testimony. See, discussion of item 75, infra. 2. Item 1 (and specifically item 1e) calls for the production of all Nestle SA documents relating to the Carnation acquisition. Our analysis of previously *564 submitted documentation indicates that no such documents have been produced. Additionally, we question whether all NHI documents have likewise been produced. 3. Item 2. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you further. 4. Items 3, 4, 5. You have grouped these items; however, our preliminary review indicates that item 3 was not responded to. With respect to item 4, we would like to know where on the 1984 return the sale was reported. We currently consider your response to item 5 sufficient. You need not search for further documents responsive to item 5 unless we advise you further. 5. Item 6. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you further. 6. Item 7. We currently anticipate detailing two agent's [sic] to the Carnation site within the next two weeks to review, inspect and copy these documents. We suggest a meeting next week with Mr. Friedland and anyone else he determines necessary to discuss all logistical problems. Item 7e. We understand that Revenue Agent Wise showed you this adjustment in *565 the Peat Marwick workpapers and you are formulating a further response. Item 7f. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you further. Item 7g. Revenue Agent showed Tom Bardoff where there was only a partial subtraction. We understand that you are formulating a response as to the remainder. Item 7h. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you further [sic].
6. Item 8. We do not view your response to Item 8 as complete. (See, our comments made at paragraph 1, supra). You are directed to the definition of documents at page 1 of the IDR. Further, we again note that no Nestle SA documents have been produced. 7. Items 10 to 13b. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 8. Item 15. We would like to know if you utilized in any way a breakdown or allocation of the sale price (among the assets). If yes, produce the breakdown or allocation schedules. If not, we do not view your response to Item *566 15 as complete. (See, our comments made at paragraph 1, supra). You are directed to the definition of documents at page 1 of the IDR. Further, we again note that no Nestle SA documents have been produced. **
9. Item 16a. If we meet in the next week we will discuss limiting this item. We note, however, that subsequent valuations can be corroborative. Revenue Agent Wise is preparing a listing; however, said listing cannot be produced to you until I.R.C. § 6103 clearance is obtained. 10. Item 17. As to Herff-Jones, we do not view your response to Item 17 as complete. (See, our comments made at paragraph 1, supra). You are directed to the definition of documents at page 1 of the IDR. Further, we again note that no Nestle SA documents have been produced. As to the other dispositions, workpapers have not been produced. 11. Item 18. We consider *567 your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 12. Items 19, 20. Since you have indicated the production would be extremely voluminous, we would prefer that you respond to the questions posed by numbers 19 and 20. If you are not willing to respond, we will make arrangements to inspect and copy the documents, as necessary. 13. Item 21. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 14. Item 22 and 23. We are in the process of verifying that the information has been provided to the support audit team. 15. Item 24. The disclosure statement indicates $ 1.4 million not $ 1.2 as stated in your letter. We believe your response is incomplete. We need to know how the 1.4 million dollars was arrived at and you should produce all documents relating to this determination. 16. Item 25a. We are reviewing your submission. Item 25b. We view this item as still outstanding.
17. Item 26. We are reviewing your submission. 18. Item 28a and b. We interpret our request as asking for the ledger *568 account. Please produce. Item 28c. Was the same amount expensed for tax purposes as booked? If not, please explain.
19. Item 29 and 30. We are reviewing your submission. 20. Item 32a and b. Please produce the general ledger account or accounts. Item 32c. Was the same amount expensed for tax purposes as booked? If not, please explain. Item 32d. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic].
21. Item 33. We are reviewing your submission. 22. Item 34. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 23. Item 35. We would like to begin inspection and copying of these records no later than Monday, February 26, 1990 and continue on a consistent basis until completion. The inspection and copying will be conducted by Ivan Rubel, with assistance as provided by the Examination Division. Additionally, we would like to know if schedules or summaries exist. 24. Item 36. We are reviewing your response and note that you have indicated a further production *569 will be forthcoming. Initially, we note that there has been no response to 36a. xxii and xxiii and that no Libby/NPEX documents have been produced. We have not received documents regarding the Board of Directors of Exportrade and NPEX and the officers of Libby, Exportrade and NPEX. We have not received the certificate of incorporation of Exportrade or its by-laws. 25. Item 37. We are reviewing your response and believe that you are in the process of producing additional documents. If this is erroneous please advise. We note that no Libby/NPEX documents were produced. Also, there was no response to 37m. 26. Items 38 to 40, inclusive. See response to item 35. 27. Item 41. We are reviewing your response and believe that you are in the process of producing additional documents. If this is erroneous please advise. We note that no Libby/NPEX documents were produced. We note that no NHI/Libby documents were produced. Also, there was no response to 41m. 28. Item 42. We are reviewing your response and believe that you are in the process of producing additional documents. If this is erroneous please advise. We note that no Libby/NPEX documents were produced. Also, there *570 was no response to 42a xxii and xxiii. Item 42b(ii) and (v). We believe your reference to IDR No. 95 is a typographical error. Please provide us with a correct IDR reference so we can evaluate your position.
29. Item 43. We assume your reference to IDR No. 115 means IDR No. 113. We are reviewing the sufficiency of your response. We believe that your are searching for additional responsive documents. We note that there was no response to Item 43m and that there was no Libby/NWTC production. 30. Item 44. We are reviewing your response and note that you have indicated a further production will be forthcoming. Initially, we note that there has been no response to 44. xxii and xxiii and that no Libby/NPEX documents have been produced. We have not received documents regarding the Board of Directors of Exportrade and NPEX and the officers of Libby, Exportrade and NPEX. We have not received the certificate of incorporation of Exportrade or its by-laws. 31. Item 45 to 47. We are reviewing your response and believe that you are in the process of producing additional documents. If this is erroneous please advise. We note that no Libby/NPEX documents were produced. *571 32. 48 to 54. See paragraph 1, supra. 33. Item 55. This information has not been provided with respect to Herff-Jones. If you need further clarification contact Revenue Agent Wise. 34. Item 56. At this time we do not need the "back up" or substantiation. For now, we simply need schedules listing the expenses claimed. 35. Item 59. See item 55, we believe the Herff-Jones documents are still outstanding. 36. Item 60a to c, inclusive. We are reviewing the sufficiency of your response. We await your response to 60d. 37. Item 62. If there were no supporting workpapers, what documents did you use to break-down or allocate the sales price among assets. 38. Items 63 and 64. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 39. Items 65 and 66. We are reviewing your response and will advise you of its sufficiency. 40. Item 67. We consider your response to this item sufficient. You need not search for additional responsive items unless we advise you futher [sic]. 41. Item 68. We are reviewing the sufficiency of your response. 42. Item 74. Are you producing *572 these documents? If no, produce all sales invoices to nonaffiliated companies by Exportrade, Nestle WTC, and NPEX. 43. Item 75. We suggest you reconsider your decision with respect to the Swiss Nationals, Mr. Angst and Mr. Maucher. Additionally, we request that the following individuals appear for transcribed interviews beginning on March 13, 1990 and continuing from day to day until completion: 1. James M. Biggar; 2. T. F. Crull; and 3. Alan MacDonald If you do not intend to make these individuals available, please notify us by February 28, 1990. Very truly yours, AGATHA L. VORSANGER Regional Counsel By: THEODORE J. KLETNICK International Special Trial Attorney cc: Joel V. Williamson, Esq. The other letters, some to Mr. Spitzer and some to Mr. Williamson, relate to scheduling of Calreco employees for interviews, disclosure of Westreco and Calreco trade secrets and tax return information, deadlines for responding to Mr. Kletnick's inquiries, and scheduling examination of Nestle Holdings' records by revenue agents. Mr. Kletnick and Ms. Schmelzle interrogated officers and employees of Nestle-related corporations during the course of the 1983-1985 audit. *573 On March 30, 1990, the Court filed respondent's Motion for Leave to File Response to Petitioner's Reply to Respondent's Notice of Objection which we granted on April 23, 1990, and on that same date filed respondent's Memorandum in Opposition to Petitioner's Response to Respondent's Notice of Objection to Petitioner's Motion for Protective Order. Neither of the parties asked for a hearing. The affidavits submitted by the parties were conflicting; however, the differences were not sufficiently significant to be vital to a resolution of the dispute. After considering the motion, the affidavits, the notices of objection, and the memoranda of authorities, we concluded that petitioner was entitled to a protective order. On April 25, 1990, we granted petitioner's motion for protective order but did not, in that order, grant the specific relief which petitioner had requested in its motion. The protective order is as follows: ORDER
On February 21, 1990, petitioner filed motion for protective order accompanied by a memorandum in support of its motion. On March 8, 1990, respondent filed Notice of Objection to the granting of petitioner's motion, accompanied by a memorandum in *574 support of his notice of objection. On March 12, 1990, petitioner filed Motion for Leave to File Reply to Respondent's Notice of Objection and Accompanying Memorandum. We granted petitioner's motion and filed its memorandum. On March 30, 1990, respondent filed Motion for Leave to File Response to Petitioner's Reply to Respondent's Notice of Objection, accompanied by a memorandum. We granted respondent's motion on April 23, 1990. The parties, in their filings, requested that the Court place all of the foregoing documents under seal until the Court acts upon petitioner's motion which the Court has done. The Court has carefully considered all of the foregoing documents and accompanying exhibits filed by the parties. The instant docketed case involves petitioner's income tax liabilities for the taxable years 1978 through 1982. Respondent is engaged in the examination of petitioner's income tax returns for the taxable years 1983 through 1985. The sole issue in the instant case pending before the Court is an adjustment under section 482 of the Internal Revenue Code relating to the contract research services fee paid by Nestec Ltd. to petitioner. The audit of *575 petitioner's returns for the taxable years 1983 through 1985 includes an examination of the identical issue involved in the instant case pending before this Court. In the course of the examination of the returns for 1983 through 1985 respondent has issued four summonses to petitioner, its employees, and an affiliated corporation which require the production of documents and which indicate that transcripts may be made pursuant to section 7520 of the Internal Revenue Code. In addition, respondent has served upon petitioner a formal document request under section 982 of the Internal Revenue Code. The periods covered by the summonses and document request are 1983 through 1985. The attorneys representing respondent in the instant proceeding pending before this Court are actively participating in the examination of petitioner's returns for 1983 through 1985. Petitioner makes its request for a protective order under the rationale of this Court's opinion in Universal Manufacturing Co. v. Commissioner, 93 T.C. 589 (1989), and the holding of the United States District Court for the Western District of Michigan in an unpublished *576 opinion in United States v. Klingman Furniture Company, Ct. File G87-13 Misc. Respondent objects almost exclusively upon the same grounds which this Court rejected in Universal Manufacturing Co. v. Commissioner, supra.He further objects because the years involved in the instant proceeding in this Court are prior to the years involved in his ongoing investigation of petitioner's returns. We conclude that the principles set forth in Universal Manufacturing are applicable here. The examination of petitioner's returns for 1983 through 1985 through direct participation of respondent's counsel who are preparing the instant case for trial may tend to circumvent the rules of this Court with respect to discovery and the case law of this Court which direct efforts toward informal discovery prior to the initiation of formal discovery, including Branerton Corp. v. Commissioner, 61 T.C. 691 (1974). We will, therefore, grant petitioner's motion for a protective order under Rule 103 of the Court's Rules of Practice and Procedure but not in the form requested by petitioner. We will, instead, follow, in general, the order granted in Universal Manufacturing, supra, *577 with the following order, and it is ORDERED, that Petitioner's Motion for Protective Order is GRANTED in that respondent's attorneys, agents, and employees engaged in representing him before this Court in the instant proceeding docketed as Docket No. 24078-88 shall not use any of the testimony, documents, or other information obtained pursuant to the four summonses and the Formal Document Request, all of which are attached as Exhibits 1, 2, 3, 4, and 5, respectively, to petitioner's Memorandum in Support of Petitioner's Motion for Protective Order, nor shall they use any testimony, documents, or other information obtained from petitioner, its employees, or related corporations pursuant to summonses, document requests, or other means taken after February 21, 1990, in connection with the examination of petitioner's income tax returns for the taxable years 1983 through 1985. It is FURTHER ORDERED, that the parties shall, on or before May 21, 1990, file with the Court their requests as to what documents should remain under seal of the Court.
On May 9, 1990, the Court held a telephone conference call with counsel for the parties. After giving counsel for the parties *578 full opportunity to discuss the progress of the audit and to explain their positions, it was apparent to the Court that its order dated April 25, 1990, was not adequate to prevent the undermining of its discovery Rules by respondent. We, therefore, on May 9, 1990, issued an order modifying the protective order dated April 25, 1990. This order granted the relief to petitioner which it had requested in Petitioner's Motion for Protective Order. The order issued on May 9, 1990, was as follows: ORDER
On May 9, 1990, the Court held a conference call with counsel for the parties in connection with petitioner's Motion to Calendar for Trial. The parties advised the Court that it was necessary to first consider the positions of the parties with respect to the effect of the Court's Order dated April 25, 1990. After a full discussion by the parties and the Court, the Court advised the parties that it would modify its order dated April 25, 1990, and grant the relief which petitioner requested in Petitioner's Motion for Protective Order filed February 21, 1990. With respect to its Motion to Calendar for Trial, petitioner advised the Court that it would need to contact witnesses residing *579 outside the country as to the specific dates that they could travel to Washington for the trial. The Court advised the parties that the trial would be set during the month of January, 1991. The premises considered, it is ORDERED, that the order dated April 25, 1990, is modified by deleting the first "ORDERED" paragraph and substituting therefor the following: ORDERED, that Petitioner's Motion for Protective Order is GRANTED in that (a) Counsel for respondent in the instant docketed case will not participate in any decisions concerning the selection of persons to be summoned for testimony in connection with the 83-85 audit. (b) Counsel for respondent in the instant docketed case will not participate in any decisions or discussions concerning the areas to be discussed with persons summoned for testimony in connection with the 83-85 audit. (c) Counsel for respondent in the instant docketed case shall not participate in any interviews or examination of any persons summoned for testimony in connection with the 83-85 audit. (d) Counsel for respondent in the instant docketed case shall not receive or review any information, transcripts, summaries, or documents from any person *580 if such information, transcripts, summaries, or documents in any form were obtained pursuant to summonses for testimony or production of documents in connection with the 83-85 audit. (e) Counsel for respondent in the instant docketed case will not participate in the drafting of any Formal Document Requests issued in connection with the 83-85 audit. (f) Counsel for respondent in the instant docketed case shall not receive any information or documents in any form from any person, if such information or documents were obtained as a result of Formal Document Requests issued in connection with the 83-85 audit. (g) Counsel in the 83-85 audit shall not discuss any information, testimony, or documents obtained during the 83-85 audit with Counsel for Respondent in the instant docketed case, nor shall any counsel for respondent in the 83-85 audit be transferred to, or otherwise render any assistance to counsel in the instant docketed case. Nothing in this Protective Order shall be construed to prevent respondent from utilizing counsel not involved in the instant docketed case in providing assistance in connection with the 83-85 audit, or from using counsel not involved in the 83-85 audit *581 to provide assistance in the instant docketed case. (h) Respondent shall maintain a log of all documents, information, or testimony in his files. This log shall include the source of all information and the time at which respondent came into possession of that information, to assist the Court in maintaining the integrity of its rules and this protective order.
It is FURTHER ORDERED, that petitioner's Motion to Calendar for Trial is GRANTED in that, upon being advised by petitioner as to the availability of witnesses, the Court will enter an order setting the case for trial in Washington, D.C., during the month of January, 1991.
On May 14, 1990, the Court filed Petitioner's Motion for Clarification of Protective Order dated May 9, 1990. That motion asked that the Court clarify its previous order to provide that it would apply to all of the entities involved in the 1983-1985 audit. It pointed out that because the various Nestle entities were engaged in common transactions that it was necessary to extend the order to all entities, not just petitioner and Nestec. The Court held a telephone conference call with counsel for the parties on May 15, 1990, at *582 which time counsel for the parties were given the opportunity to present fully their respective positions with respect to the motion for clarification. On May 15, 1990, the Court issued the following order: ORDER
On May 14, 1990, the Court filed Petitioner's Motion for Clarification of Protective Order Dated May 9, 1990. The Court held a telephone conference with counsel for the parties on May 15, 1990, at which time the Court heard the arguments of the parties with respect to the said motion. Upon conclusion of the arguments, the Court advised the parties that it would grant petitioner's motion and would clarify its order of May 9, 1990, with a further order. Pursuant to the said telephone conference, it is ORDERED, that petitioner's motion is GRANTED, and the Court's Order of May 9, 1990, is clarified in that all references to "the 83-85 audit" shall be interpreted to mean all audits of income tax returns of petitioner and of all corporations related to petitioner.
During the telephone conference calls, Mr. Kletnick asked the Court to require him and other counsel for respondent to withdraw from the Tax Court proceeding instead of imposing restrictions *583 on their activities in the audit. The Court advised counsel that it would not do so. Mr. Kletnick advised the Court that respondent considered the participation in the audit to be more important than representing respondent in the instant proceeding. On May 17, 1990, the Court received from respondent's regional counsel of the North Atlantic Region, a letter advising the Court that counsel for respondent, Mr. Kletnick, Mr. Barral, and Ms. Schmelzle, would no longer represent respondent in the instant proceeding. The letter pointed out that their assistance in the audit was critical and outweighed the substantial detriment resulting from their withdrawal in the instant proceeding . Regional Counsel further advised that Mildred Moon would represent respondent in the instant proceeding. On June 27, 1990, the Court filed respondent's Motion to Continue in which he advised the Court that respondent would also be represented in the instant proceeding by Bernard Goldstein, Jane Wilson, and Raymond Kahn. On May 25, 1990, the Court filed respondent's Motion for Reconsideration, accompanied by Memorandum of Points and Authorities in Support of Respondent's Motion for Reconsideration. *584 In his motion, respondent moved that the Court reconsider its order dated April 25, 1990, as modified by its order dated May 9, 1990, and as clarified by its order dated May 15, 1990. We granted respondent's motion in that we agreed to reconsider the said orders and granted petitioner until July 9, 1990, within which to file a notice of objection and accompanying memorandum of authorities in support of such notice. The Court, on July 9, 1990, filed petitioner's Notice of Objection to Respondent's Request for Additional Relief Sought in the Motion for Reconsideration and Petitioner's Memorandum in Support of its Notice of Objection to Respondent's Request for Additional Relief Sought in the Motion for Reconsideration. On June 27, 1990, the Court filed respondent's Motion to Stay Protective Order in which respondent asked that the Court stay the protective order until it reconsidered respondent's motion for reconsideration. On July 31, 1990, the Court filed petitioner's Notice of Objection to Respondent's Motion to Stay Protective Order. On July 31, 1990, the Court denied respondent's Motion to Stay Protective Order. The case is set for trial on January 7, 1991. If we stayed *585 the protective order, counsel for the parties would not have adequate time to prepare for trial. Moreover, such a stay would permit former counsel for respondent to participate in trial preparation after they elected, instead, to participate in the 1983-1985 audit. In another set of pleadings we considered continuing the trial to a later date. We concluded that the trial should not be continued. We granted respondent's motion for reconsideration primarily because of the importance of the issue. The periods of limitations on assessment of additional tax involved in the 1983 - 1985 audit were to expire on June 30, 1990, unless petitioner and the other entities extended the periods of limitation. The Commissioner mailed a statutory notice of deficiency to petitioner on June 27, 1990. We indicated in our order dated April 25, 1990, that the principles of our opinion in Universal Manufacturing Co. v. Commissioner, 93 T.C. 589 (1989), were applicable here. Indeed, in that order we declined to grant the relief which petitioner requested in its motion for protective order but, instead, granted the relief provided in Universal Manufacturing. We later concluded *586 that the relief in our original protective order was not adequate and we amended the order on May 9, 1990, and granted the relief which petitioner requested. For convenience, we will hereinafter sometimes refer to the series of orders as the protective order. Discussion
Respondent, in his notices of objection, expressed his disagreement with the holding of the Court in Universal Manufacturing Co. v. Commissioner, supra.During the telephone conference call with counsel for the parties on May 9, 1990, it was apparent to the Court that the intense involvement of respondent's trial counsel in the 1983-1985 audit would make it virtually impossible to exclude from evidence at the trial the materials which they were able to gather during the audit. In addition, the activities of respondent's trial counsel in the 1983-1985 audit amounted to the taking of discovery depositions of petitioner's employees which is not permitted under the Tax Court Rules unless all of the parties agree. Respondent, throughout this proceeding on the protective order, has objected to the protective order on the same grounds he argued in Universal Manufacturing Co. v. Commissioner, supra. *587 We rejected those arguments in Universal Manufacturing and we continue to reject such grounds in the instant case. Some of the grounds previously relied upon by respondent are expressed in different terms in the motion for reconsideration. After analyzing the authorities and arguments of the parties contained in the motion for reconsideration, notice of objection, and accompanying memoranda, we continue to conclude that the activities of counsel for respondent and the use of summonses in the 1983-1985 audit circumvent or undermine this Court's Rules of discovery and that the protective order was necessary. We will, nevertheless, again articulate our reasons by addressing respondent's motion for reconsideration. It is undisputed that the Tax Court has historically permitted limited discovery and, although the Court has expanded the Rules on discovery, its Rules are not as broad as the Federal Rules of Civil Procedure. Compare Rules 70 through 76, Tax Court Rules of Practice and Procedure, with Rules 26 through 37, Federal Rules of Civil Procedure (FRCP). The summonses under section 7602 which were served upon employees of petitioner *588 to appear and be interviewed and to deliver documents in the 1983-1985 audit are in the nature of discovery depositions. They are not unusual in the audit process. They were limited to the years being audited but related to the identical issue pending before the Court in this proceeding for earlier years. The background of the contractual arrangement between petitioner and Nestec is identical for all years. The individuals covered by the summonses were previously interviewed by agents of the Internal Revenue Service in the audit of the years before the Court. In Universal Manufacturing, the summonses were issued pursuant to a criminal investigation of the taxpayers which included the taxable years before the Court in that case. That case did not involve the participation of respondent's trial counsel in the criminal investigation, as does this case. We have set forth above some of the activities of respondent's counsel, Mr. Kletnick, in the 1983-1985 audit. In addition, it should be pointed out that petitioner offered, during the audit, to enter into a closing agreement to be bound in those years by the decision of this Court on the section 482 issue in the instant case. *589 The examining agents told representatives of petitioner that they would have to check with Mr. Kletnick. They later advised petitioner's representatives that they were unwilling to enter into any such agreement. It is also significant that when the Court directed Mr. Kletnick and the other trial counsel to cease their audit activities, regional counsel, instead, withdrew such counsel from this proceeding. Mr. Kletnick and Ms. Schmelzle interrogated employees of the Nestle group of corporations who were summoned to appear before the agents. This activity is not permitted under the Tax Court Rules in a docketed case. When these activities are viewed in their totality, it appears to us that Mr. Kletnick was in charge of the 1983-1985 audit of the returns of petitioner and related corporations. There is no question but that these activities and the use of the summonses undermined the discovery Rules of the Tax Court. Tax Court Rules on Discovery
The operations of the Tax Court are unique among the trial courts in the Federal court system. Brooks v. Commissioner, 82 T.C. 413, 429 (1984), affd. without published opinion 772 F.2d 910 (9th Cir. 1985). *590 The unique operations of the Tax Court necessarily require its Rules to be dissimilar from the FRCP. In general, where feasible, the Court has adopted Rules which are patterned after the FRCP. In other instances, however, the Rules of the Tax Court are quite different. The Rules on discovery perhaps most clearly illustrate the uniqueness of the Tax Court Rules. "Proposed Rules of the Tax Court," 26 Tax Lawyer 377-381 (1972). The Court first adopted discovery Rules effective January 1, 1974. Prior to that time there was no discovery in the Tax Court or the predecessor Board of Tax Appeals. Historically, the Tax Court has relied heavily upon stipulations of fact. Branerton Corp. v. Commissioner, 61 T.C. 691 (1974).Discovery was the subject of debate for the 50 years prior to its adoption in limited form by the Court in 1974. H. Dubroff, The United States Tax Court: An Historical Analysis, 297-298 (1979) (hereinafter referred to as Historical Analysis). The Court approached adoption of limited discovery in its Rules with some misgivings and very cautiously. Historical Analysis, supra at 304-305. It was recognized that the Government had the most to *591 gain by adoption of discovery rules. "Proposed Rules of the Tax Court," supra at 380. In his motion for reconsideration, respondent characterizes the Court's protective order as a "level playing field approach." Perhaps it is well to examine one of the elements of this metaphor at this point, i.e., the size of the "field." The parties' knowledge of the facts in a Tax Court case is noticeably different from the access to facts generally in other Courts. In the District Court, the "field" is circumscribed when the complaint and answer are filed. Discovery under the Federal Rules of Civil Procedure are very broad and afford both parties the opportunity to discover the facts of their adversaries. The "field" in a Tax Court proceeding is not circumscribed by the filing of the petition and answer. The "field" is first delineated when the Commissioner examines the taxpayer's tax returns. As amply demonstrated in this case, the Commissioner has substantial tools to ascertain the facts before he mails a statutory notice of deficiency to the taxpayer which provides the taxpayer with a "ticket" to the Tax Court. When the Tax Court adopted its first discovery Rules there was considerable *592 concern that the administrative process of examining returns would become lax because of the knowledge that discovery would permit gathering of additional information by respondent. Historical Analysis, supra at 303. Goldfein & Levine, "Tax Court Proposes Far Reaching Changes in its Rules of Practice and Procedure," 37 Journal of Taxation 66, 68 (Aug. 1972). Because "in most cases the Government had access to all of the necessary information through its administrative investigatory powers" (Historical Analysis, supra at 304), it was argued that the Government should not be accorded broad discovery to supplement its audit examination. In addition, the objection was raised that discovery would disturb the "relatively uncomplicated and inexpensive format" that prevailed in the Tax Court and would "unnecessarily prolong the proceeding and invariably increase the cost of litigation." Historical Analysis, supra at 303. In particular, there was concern "about the great potential for abuse of discovery procedures, especially on the part of the Government which, in most cases, would not bear the same economic and time constraints confronted by taxpayers." Historical Analysis, *593 supra at 303. Finally, there was "apprehension that pretrial discovery would damage irrevocably the effectiveness of the stipulation procedure." Historical Analysis, supra at 303. Discovery proceedings , it was feared, would impede or at least delay settlement of docketed cases and "would increase the court's workload" by "involving the court in [new] controversies." Historical Analysis, supra at 304. Mindful of these important concerns, the Court closely limited the scope of the new pretrial discovery procedures that it authorized. Four of those restrictions are of particular relevance here. First, no provision was made for discovery depositions. Rules 70(a)(1), 80(a). The Note accompanying Rule 70(a) explained: Depositions have not been adopted in these Rules as a discovery device. In that respect, these Rules do not follow the Federal Rules. The new procedures introduced into Tax Court practice by these Rules are deemed sufficient to enable a party to obtain information needed to prepare for trial. Whatever additional benefits might be obtained by the use of discovery depositions would appear to be outweighed by the problems and burdens they entail *594 for the parties as well as the Court. * * * [60 T.C. 1057, 1097 (1973).] [2]
Second, discovery was not permitted from nonparties (except in the special case of transferee liability, which is not involved here). Rules 70-73. Third, the parties were required "to attempt to attain the objectives of discovery through informal consultation or communication before utilizing the discovery procedures provided in these *595 Rules." Rule 70(a)(1). Odend'hal v. Commissioner, 75 T.C. 400, 404 (1980); International Air Conditioning Corp. v. Commissioner, 67 T.C. 89, 92 (1976); Branerton Corp. v. Commissioner, supra at 692.Fourth, discovery was confined to information that "is relevant to the subject matter involved in the pending case" and is either admissible at trial or "reasonably calculated to lead to discovery of admissible evidence." Rule 70(b). Each of these four carefully wrought restrictions would be eviscerated if respondent were free to use, in a case already docketed in this Court, testimony or documents developed in a subsequent-year summons proceeding. First, through the subsequent-year summons, respondent could conduct oral examinations under oath which are equivalent to discovery depositions without agreement of petitioner under Rule 75 and without supervision of the Court under Rule 76. Second, respondent also would be able to use information and materials obtained from nonparties under the subsequent-years' summonses. Third, he could proceed directly against the taxpayer under the coercive summons power without informal consultation *596 and negotiation. Fourth, because of the exceedingly broad concept of potential relevance applicable to Internal Revenue Service summonses (e.g., United States v. Arthur Young & Co., 465 U.S. 805, 814 (1984), cert. denied 466 U.S. 936 (1984)), respondent would have access to a much wider range of information for use in the docketed case than would be permissible under Rule 70(b). United States v. Powell, 379 U.S. 48 (1964).The standard that respondent must meet for a summons under Powell and Arthur Young is much more relaxed than that prescribed for discovery under the Tax Court Rules. Furthermore, respondent's ability to undermine these limitations on discovery would give rise to the undesirable consequences that, as discussed above, the Rules were scrupulously designed to avoid. The Court's Rules on discovery must be available to both petitioner and respondent on the same terms in a Tax Court proceeding. The participation of respondent's counsel in the 1983-1985 audit confers an unfair advantage upon respondent. In the instant case the individuals who were served with summonses under section 7602 were employees of petitioner. *597 We assume that petitioner would be able to compel its employees to undergo questioning by petitioner's own counsel. Nevertheless, this compulsion is based upon the employer-employee relationship, not the "Court-enforceable" compulsion of a summons. Petitioner has no right to summons employees of respondent during the audit. Petitioner might very well want to know the basis of adjustments proposed by the revenue agents or the identity of "comparables" relied upon by respondent. Petitioner bears the burden of proving that respondent abused his discretion in reallocating income or deductions under section 482. Petitioner cannot summons respondent's agents for discovery purposes in the Tax Court proceeding without consent of respondent. Rule 74. Respondent's trial counsel has the power in the audit activity to issue summons to third party witnesses and to take testimony under oath without even advising petitioner of the identity of the third party witness unless the witness is a record keeper. Section 7602. This action requires no assent upon the part of petitioner, which would be required if proceeding under Rule 74 of the Court's Rules. Petitioner enjoys no such power. It *598 is not merely the power to investigate and interview prospective cooperative witnesses that is important in preparing for trial but, instead, the powerful effect of a summons whereby a prospective witness can be compelled to appear and testify under oath. This summons power possessed by respondent's trial counsel through his participation in the audit unfairly upsets the balance of discovery rights which the parties are granted under the Tax Court Rules. Further, respondent's opportunity to use the summons power to gather information for the docketed case would encourage "laxity" in the preceding audit because any "errors or oversights" (Historical Analysis, supra at 303) could be cured through the subsequent-years' summons. To diminish respondent's incentive to develop facts and issues carefully during an audit would directly contravene the Court's admonition in Durkin v. Commissioner, 87 T.C. 1329, 1402-1403 (1986), affd. 872 F.2d 1271 (7th Cir. 1989), cert. denied U.S. (1989), that tax cases are to be thoroughly investigated before -- rather than after -- the notice of deficiency is issued. An inadequate audit produces a docketed case *599 that is ill-defined and unmanageable, thus requiring "much more time * * * by the Court and the attorneys to prepare the case for trial and to actually try the case." 87 T.C. at 1402. In addition, respondent's ability to use the summons power to his advantage in docketed cases would impede the stipulation process required by Rule 91, render docketed proceedings more complicated and expensive for the taxpayer, and interfere with the Court's ability to oversee and manage its caseload. Under normal Tax Court procedures, the notice of deficiency is designed to define the issues and focus the litigation. If, however, respondent were free to develop new theories and information through a subsequent-year summons, without limitation, the notice of deficiency could not serve its delimiting purpose. In the same way, the stipulation process -- which is the "mainstay of practice in the Tax Court" (Note to Rule 91, 60 T.C. at 1117) and "the bedrock of Tax Court practice" ( Branerton Corp. v. Commissioner, supra at 692) -- would be made more difficult and greatly delayed while the subsequent-years' summons is pursued. Similarly, respondent would *600 be unable to provide a full and timely response to the taxpayer's discovery requests in the docketed case, because the formulation of his final legal and factual positions would necessarily have to await the results of the summons. The Court would be hindered in efficiently managing and expeditiously scheduling the docketed case, because respondent's litigation posture would depend on the progress of the independent subsequent-years' summons. All of this would be fundamentally at odds with the basic objectives of this Court's procedures. Rule 101 provides in part that "none of these methods or procedures [of discovery] shall be used in a manner or at a time which shall delay or impede the progress of the case toward trial status or the trial of the case on the date for which it is noticed." We reiterate the point that we made in Universal Manufacturing Co. v. Commissioner, supra at 594, i.e., the motive or intent of the Commissioner in the audit is unimportant. The use of the information developed in the subsequent audit undermines our discovery Rules. Notwithstanding the irrelevancy of the intent of the Commissioner, how could respondent's trial counsel in *601 the docketed case resist improving his case while actively participating in an audit of the identical issue for a later year? Most major business entities are audited each year and many issues raised by the examining agents are "continuing" issues. If the Court's discovery Rules can be indiscriminately undermined by respondent's counsel in the audit process, the litigation can be prolonged indefinitely. The probative value of data for years subsequent to the years before the Court must be weighed against considerations of delay and waste of time. Sundstrand v. Commissioner, 89 T.C. 810, 814-815 (1987). In related contexts the courts have refused to allow discovery or other compulsory process in one proceeding to be used to subvert or circumvent the discovery limitations applicable in another proceeding. For example, in United States v. Sells Engineering, Inc., 463 U.S. 418, 433-434 (1983), the Supreme Court cautioned that: use of grand jury materials by Government agencies in civil or administrative settings threatens to subvert the limitations applied outside the grand jury context on the Government's powers of discovery and investigation. *602 * * * the limitations imposed on investigation and discovery exist for sound reasons * * *. If Government litigators or investigators in civil matters enjoyed unlimited access to grand jury material, * * * there would be little reason for them to resort to their usual, more limited avenues of investigation. To allow these agencies to circumvent their usual methods of discovery would not only subvert the limitations and procedural requirements built into those methods, but also would grant to the Government a virtual ex parte form of discovery, from which its civil litigation opponents are excluded * * * The same conclusion is equally warranted here. United States v. LaSalle National Bank, 437 U.S. 298, 312 (1978); United States v. Kordel, 397 U.S. 1, 11-12 (1970). Respondent contends that the Tax Court lacks the power to prevent him from circumventing the Rules of discovery. This is not, and cannot be, the law. The Court possesses such authority which is derived from two sources. Authority of the Tax Court
One source of authority must necessarily be implied from the power of the Court to prescribe rules of practice *603 and procedure. The second source of authority is inherent in the Court's obligation, as a judicial body, to protect the integrity of its processes and to regulate the proceedings and parties or representatives of parties that appear before the Court. These sources of authority adequately empower the Court to prevent any party from undermining the Court's discovery Rules. A. Implied Authority
The implied authority of the Tax Court to enforce its Rules is a necessary adjunct to the full and effective implementation of the basic rulemaking power granted by section 7453. This doctrine of implied authority is well settled and has been applied by the Supreme Court specifically to tax tribunals. Goldsmith v. United States Board of Tax Appeals, 270 U.S. 117 (1926), affg. 4 F.2d 422 (D.C. Cir. 1925), involved a challenge to the power of the Board of Tax Appeals (the predecessor of this Court) to establish rules for the admission of attorneys to practice before it. Although Congress had not conferred explicit authority governing the admission of attorneys, the Board relied on the statutory provision that "'the proceedings of the Board and its divisions *604 shall be conducted in accordance with such rules of evidence and procedure as the Board may prescribe.'" 270 U.S. at 121.Emphasizing "the quasi judicial nature of [the Board's] duties" (270 U.S. at 121), the Supreme Court upheld the Board's admission requirements despite the absence of any express statutory authorization, reasoning that "so necessary is the power and so usual is it that the general words by which the Board is vested with the authority to prescribe the procedure in accordance with which its business shall be conducted include as part of the procedure rules of practice for the admission of attorneys." 270 U.S. at 122. The analysis of Goldsmith is controlling here. The Tax Court prescribes its Rules of Practice and Procedure pursuant to section 7453, which provides that "the proceedings of the Tax Court and its divisions shall be conducted in accordance with such rules of practice and procedure (other than rules of evidence) as the Tax Court may prescribe." This broad grant of rulemaking authority plainly encompasses the Court's discovery Rules, including the limitations placed on discovery. The Court's authority to regulate *605 the conduct of attorneys appearing before it to ensure that they are not involved in undermining its discovery Rules -- which is all that the protective order does -- is "so necessary" ( Goldsmith v. United States Board of Tax Appeals, 270 U.S. at 122) to the Court's protection of the integrity of its own processes that it cannot reasonably be questioned. The express provisions of the Rules also support the Court's action. For example, Rule 103 specifically provides for the entry of protective orders. In addition, Rule 1(a) states that "Where in any instance there is no applicable rule of procedure, the Court or the Judge before whom the matter is pending may prescribe the procedure." B. Inherent Authority
The second source of authority which the Tax Court possesses to prevent respondent from undermining the discovery Rules is inherent in the Court's status as a judicial tribunal. "It cannot be doubted" that courts have "'inherent'" powers to adopt rules "'of sound judicial practice although in nowise commanded by statute or by the Constitution.'" Thomas v. Arn, 474 U.S. 140, 146-147 (1985). Some examples of inherent authority are the *606 following: the inherent authority to enter a protective order prohibiting dissemination of information obtained through discovery ( Seattle Times Co. v. Rhinehart, 467 U.S. 20, 35 (1984)); the inherent power to correct that which has been wrongfully done by virtue of the Court's process ( United States v. Morgan, 307 U.S. 183, 197 (1939)); and the inherent authority of courts "over their own process, to prevent abuse, oppression and injustice" ( Gumbel v. Pitkin, 124 U.S. 131, 146 (1888)). One of the inherent powers of particular application here is the broad inherent authority over attorneys who practice before the Court. As the Supreme Court explained in Theard v. United States, 354 U.S. 278, 281 (1957) (citations omitted), the courts "have autonomous control over the conduct of their officers, * * * [including] lawyers * * *. The court's control over a lawyer's professional life derives from his relation to the responsibilities of a court. * * * '[a lawyer is] an officer of the court, and, like the court itself, an instrument or agency to advance the ends of justice.'" Because lawyers "have historically *607 been 'officers of the courts'" and "'assistants to the court in search of a just solution to disputes'" ( Ohralik v. Ohio State Bar Assn., 436 U.S. 447, 460 (1978) (citation omitted)), and because "The conduct of * * * counsel * * * may directly affect the administration of public justice * * * [the courts must] be in a position to adopt and enforce their own self-preserving rules." McDonald v. Pless, 238 U.S. 264, 266 (1915).Thus, "Since the early days of English common law, it has been widely recognized that courts possess the inherent power to regulate the conduct of attorneys who practice before them." Howell v. State Bar of Texas, 843 F.2d 205, 206 (5th Cir. 1988), cert. denied 466 U.S. 950 (1988). Section 7452 provides that the Secretary (which includes his designee, the Commissioner) shall be represented in the Tax Court by the Chief Counsel for the Internal Revenue Service. There is no suggestion in that provision that the attorneys of the Chief Counsel's Office are not equally subject to orders of the Tax Court and, therefore, subject to disciplinary proceedings to the same extent as representatives of the *608 taxpayers who are admitted to practice before the Tax Court. The Tax Court indisputably has the inherent authority to protect the integrity of its proceedings and to prevent a party from undermining its Rules. The Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 487, "establishe[s], under Article I of the Constitution of the United States, a court of record to be known as the United States Tax Court." Section 7441. This legislation reflected the Court's "status as a judicial body" and "recognize[d] the Tax Court as a 'court' * * *. * * * the Tax Court has the characteristics of a court and performs its functions in a judicial manner." Burns, Stix Friedman & Co. v. Commissioner, 57 T.C. 392, 395, 396 (1971). Prior to the establishment of the Tax Court under Article I of the Constitution, the Tax Court and its predecessors were independent agencies of the executive branch but, nevertheless, judicial tribunals. The Supreme Court described the Board of Tax Appeals as being "quasi judicial in nature." Goldsmith v. United States Board of Tax Appeals, supra at 121.We pointed out in Burns, Stix Friedman & Co. v. Commissioner, supra at 395, *609 that the Tax Court of the United States performed only judicial functions. The Court of Appeals in Kenner v. Commissioner, 387 F.2d 689, 690 (7th Cir. 1968), affg. an unreported dismissal, cert. denied 393 U.S. 841 (1968), stated that "Although the tax 'court' is an independent agency in the executive branch its powers and business are judicial in nature." (Fn. ref. omitted.) The Court of Appeals for the Third Circuit stated in Stern v. Commissioner, 215 F.2d 701, 707-708 (3d Cir. 1954), revg. on other grounds 21 T.C. 155 (1953) ("from its inception as the Board of Tax Appeals in 1924 [the Tax Court] has operated only as a judicial tribunal" and "Its powers are wholly judicial in character. * * * The Tax Court is thus for all practical purposes a judicial tribunal operating in the federal judicial system"). All courts are vested with inherent powers. Although most cases discussing inherent powers involve Article III courts, such powers are in no way limited to those tribunals. Rather, it is the nature of a court qua court that gives rise to these inherent powers, e.g., Standing Comm. on Dis. of United States v. Ross, 735 F.2d 1168, 1170 (9th Cir. 1984), *610 cert. denied 469 U.S. 1081 (1984), ("Any court which has the power to admit attorneys to practice may also sanction them for unprofessional conduct"). Numerous decisions establish that the Tax Court possesses inherent authority in the discharge of its judicial functions. As explained in Louisville Builders Supply Co. v. Commissioner, 294 F.2d 333, 339 (6th Cir. 1961), revg. on other grounds an order of the Court, the Tax Court has "such powers as may be inherent in it * * * as such quasi judicial body." Thus, for example, the Tax Court has the inherent authority to reopen a final decision that was procured by fraud upon the Court, because it, like any court, must have the power to protect "the integrity of its own decision." Kenner v. Commissioner, 387 F.2d at 691. The Tax Court has inherent power to dismiss a case for lack of prosecution. Montgomery v. Commissioner, 367 F.2d 917, 919 (9th Cir. 1966), affg. an order of this Court. The protective order which we entered in the instant case is certainly within the well-established inherent authority of this Court. The order serves to protect the integrity of *611 the Court's discovery Rules which, in turn, is essential to the fair operation of the litigating process on all parties. The order merely regulates the actions of attorneys who appear before the Court to ensure that the Rules of discovery are not undermined. The power to regulate the actions of the attorneys who appear before the Tax Court, as pointed out above, is an especially broad power. Respondent asserts that the Court does not have the power to circumscribe respondent within the confines of the Court's Rules of discovery. This claim, if adopted, would provide respondent with a special privilege. No such special privilege exists, nor will we create one. In addition, respondent contends that the protective order is in excess of the Court's limited jurisdiction and a usurpation of power because it improperly restricts the Commissioner in the exercise of his summons authority. There is no merit to this contention. The protective order does not, in any way, restrict the Commissioner in the exercise of his summons authority. He may issue such summonses as he deems appropriate in connection with the 1983-1985 audit. If petitioner or another one of the Nestle affiliates challenges *612 any of the summonses it may proceed in the U.S. District Court. We have assumed no control or supervision over the summons process. Respondent attempts to "bootstrap" his position by reliance upon United States v. Gimbel, 782 F.2d 89 (7th Cir. 1986).In that case the Commissioner served a summons before he mailed a statutory notice of deficiency but did not seek enforcement until after the notice of deficiency was mailed. The Court held that the validity of the summons was to be tested as of the date of issuance of the summons and that the taxpayer had not demonstrated that the pending Tax Court proceedings deprived the District Court of jurisdiction to enforce the summons or that enforcement of the summons might constitute an abuse of the process of the District Court. Gimbel does not support respondent's position. It merely upholds enforcement of the summons. Petitioner in the instant case does not challenge the enforcement of a summons in the Tax Court. The holding in Gimbel has nothing to do with the admissability of evidence in a Tax Court proceeding. Respondent argues that Congress did not expressly restrict the use of information obtained in an *613 administrative summons in a Tax Court proceeding. That is correct, but the argument flies in the face of the implied and inherent authority of the Tax Court to prevent the undermining of its discovery Rules. Respondent complains that the Court has no supervisory authority over the manner in which he conducts audits and no authority as to assignments of counsel with respect to years not before the Court. We are not exercising any such authority. We are, instead, exercising our authority over counsel who appear in this Court. Although counsel for respondent asked that we order him to withdraw from the Tax Court proceeding, we did not do that. We made it clear in the order that respondent could use counsel in the audit but not the same counsel who were assigned to try the instant case. The only limits we place upon respondent in the conduct of the audit are designed to protect the discovery Rules from being undermined by the trial attorneys in this docketed case. The agent in charge of the 1983-1985 audit and some of the revenue agents are the same agents who examined petitioner for the years before the Court. Our protective order did not affect them or their conduct. We have *614 not questioned the authority of the agents to issue summonses in the audit. They are authorized to do so by section 7602. Policy Discussion
Respondent argues that our protective order "strikes at the heart of respondent's Large Case Program." We think this overstates the effect of our protective order. The only limits imposed by the protective order is on the attorneys of respondent who will try the docketed case. Respondent has referred to policy statements of officials of the Internal Revenue Service in connection with the Large Case Program to demonstrate the impact of our protective order on their program. The stated policy and practice of the Internal Revenue Service has been to use attorneys from the Chief Counsel's Office only as advisors. Commissioner Goldberg, speaking at a time when he was chief counsel, explained the use of Chief Counsel attorneys in audits as follows: our attorneys will not become members of an examination team. We lack the resources in the Office of Chief Counsel to do so; more important, however, we lack the skills. Our role is limited to providing legal advice to examiners who are among the Service's most experienced and highly trained *615 professionals. We anticipate that our advice will be requested on few of the numerous issues that arise in a typical ISP [Industry Specialization program] examination (current and proposed Coordinated Issues and those that raise novel and significant legal, procedural, or tactical questions). Given our role, it will be unusual for a field attorney to appear "on-site" during an examination. [Goldberg & Olson, "Industry Specialization in the Chief Counsel's Office," 37 The Tax Executive 289, 296 (July 1985).] A recent report by the Internal Revenue Service reiterated that the examination division, not the Chief Counsel's Office, has the " responsibility for conducting and controlling the examiniation. Examination will continue to make the decisions on issues arising during the examination." Internal Revenue Service, Assistant Commissioner (Examination), "Proposal for Changes to Coordinated Examination Programs" 19 (Apr. 9, 1990). We have set forth in some detail above some of the activities of respondent's counsel in the 1983-1985 audit. The role of Mr. Kletnick extends well beyond that of a legal adviser. He appears to us to be in charge of the audit. *616 It is important to keep in mind that the issue being investigated in the 1983-1985 audit is the identical issue to be litigated for earlier years in the instant case. Other Arguments
Respondent argues that Rule 103 which covers protective orders does not authorize the protective order which we entered because the information he has obtained was not obtained through the Tax Court discovery process. The provisions of Rule 103 are not so restrictive. Courts have inherent authority to issue a protective order to prevent a party's use in litigation of information obtained outside the channels of discovery. Chancellor v. Boeing Co., 678 F. Supp. 250, 253 (D. Kan. 1988); Amarin Plastics v. Maryland Cup Corp., 116 F.R.D. 36, 38-39 (D. Mass. 1987); In re FMC Corp., 430 F. Supp. 1108 (S.D. W.Va., 1977). This would certainly apply, for example, to protect grand jury materials. Respondent relies upon In re Rafferty, 864 F.2d 151, 155 (D.C. Cir. 1988), but the Court of Appeals stated that "We do not question the power of the district court to regulate discovery or the manner in which materials may be used in a litigation *617 pending before it." (Emphasis added). Respondent relies upon cases which involve limitations on public dissemination or other distributions of information obtained outside the discovery process. The opinion in Rafferty makes clear that the limitation on public dissemination is a First Amendment issue and resolution of that issue does not control the question of the court's authority to limit the use of materials in the litigation before it. Respondent argues that the protective order constitutes an exclusionary rule of evidence in violation of Section 7453. That section provides that proceedings in the Tax Court shall be conducted in accordance with its rules of practice and procedure and the rules of evidence applicable to a trial without a jury in the District of Columbia. The Federal Rules of Evidence govern the admissibility of evidence in the Tax Court. Our protective order is not based upon an evidentiary rule and the Federal Rules of Evidence would not override the inherent authority of a trial Court to enforce its Rules by excluding evidence obtained in violation of a protective order. Respondent also argues that the protective order is in the nature of an injunction *618 based upon the exercise of equity jurisdiction which the Tax Court does not possess. That line of reasoning would impair the power of the Court to enter almost any kind of protective order. In Becker v. United States, 451 U.S. 1306, 1309 (1981), the Supreme Court held that an order is not an injunction "simply because the coercive power of the court is invoked." Moreover, we recently pointed out that the Tax Court follows equitable principles in deciding cases within its jurisdiction but not to expand its jurisdiction. Woods v. Commissioner, 92 T.C. 776, 784-785 (1989).We are certainly not expanding our jurisdiction by entering the protective order but we are, instead, protecting the integrity of our Rules, which we have the power to do. Respondent points to the disclosure provisions, namely section 6103(h)(4), which allow disclosure of certain information in judicial proceedings. It is difficult to see how this provision would override the power of the Court to protect its discovery Rules by excluding evidence obtained in the audit. If respondent's argument were correct, the disclosure provision would override the Federal Rules of Evidence and *619 case law involving illegally obtained evidence. Disclosure and admissibility are entirely different concepts. It is readily apparent from the discussion above that our protective order is not based upon the disclosure provisions and they have no application here. Conclusion
Based upon the foregoing, we continue to conclude that the protective order as clarified and modified was proper and supported by ample authority. We do not intend to imply that all activities of respondent's trial counsel in an audit would justify a protective order like the one issued in this case. The compelling facts in this case justified the provisions in the protective order which we issued. An appropriate order will be issued. Footnotes
1. Unless otherwise indicated, all section numbers refer to the Internal Revenue Code in effect for the taxable years 1978, 1979, 1980, 1981, and 1982, and Rule numbers refer to the Rules of Practice and Procedure of this Court.↩
*. There seems to be some dispute as to the origin of many of the items. The Examination Division letter states that IDR No. 174 was "essentially a compilation of numerous past IDR's." Your letter states "the substantial majority of the documents requested were not the subject of previous document requests." While this dispute may be semantics, we feel constrained to point to a few examples. IDR No. 72 was issued on October 12, 1988, the second request was made on November 4, 1988 and the third request was made on November 28, 1988. From time to time thereafter IDR No. 72 was listed as open. Similarly, IDR No. 138 was issued on May 28, 1989, the second request was made on June 12, 1989 and the third request was made on July 7, 1989. From time to time thereafter IDR No. 138 was listed as open. There was no response from you regarding IDR No. 138 or IDR No. 72. In the preparation of IDR No. 174, IDR No. 72 formed the basis for item 3 and IDR No. 138 formed the basis for item 14. Obviously, your failure to respond in a timely and complete manner has led to the inclusion of many document requests, which had you taken a more forthright posture might have been handled differently.↩
**. After review of your February 21, 1990 submission, the breakdown is still outstanding as is the final sales contract.↩
2. As subsequently amended, Rule 74 now permits discovery depositions (of parties and nonparties) but only upon consent of all the parties to the case. Rule 74, 71 T.C. 1177, 1194-1195 (1979). "By limiting the availability of discovery depositions" to this "narrow framework," "the Court intends to avoid the excessive and abusive use of discovery depositions." Note to Rule 74, 71 T.C. at 1195. Discovery depositions of nonparty witnesses also are now allowed in certain "extraordinary" circumstances. Rule 75, 79 T.C. 1135, 1140-1142 (1982). In addition, new Rule 76, effective July 1, 1990, for the first time, permits nonconsensual depositions of expert witnesses if approved by the Court. 93 T.C. .↩